# District Court of the Navajo Nation
## Judicial District of Shiprock, New Mexico

**Harry Tome, et al., Plaintiffs,**

**v.**

**Raymond Marshall, et al., Defendants.**

**Decided November 4, 1998**

## ORDER

Judge Lorene Ferguson presiding.

THIS MATTER came before this Court on a Complaint for Forcible Entry and Detainer. The Plaintiffs are also seeking sanctions and further injunctive relief. Upon review of the record and upon having conducted a hearing, this Court makes the following findings:

1. In SR-INJ-776-72, a default judgment was entered on December 12, 1974 and the Court ordered a permanent injunction in which the only named Defendant was Raymond Marshall and in which the court ordered the following:

> Mr. Marshall be permanently restrained and enjoined from verbal and physical harassment of Plaintiffs.

> Mr. Marshall be permanently restrained and enjoined from "interfering with or encroaching upon the grazing rights of the Plaintiffs [and Mr. Marshall shall] forever refrain from trespassing onto Plaintiffs' customary grazing use area, and shall cease any and all attempts at constructing any buildings upon Plaintiffs' customary grazing area...."

> Mr. Marshall [shall] remove trailer house and all related structures and any and all equipment from the present disputed site, at the earliest convenience, to any location near his mother's customary grazing area, provided he shall obtain proper permission and consent before relocating.

> Defendant shall abide by any and all established grazing and homesite regulations and he shall make all necessary arrangements with the appropriate authorities, to graze his allowable sheep units of 20 sheep units near his birthplace as allowed pursuant to his father's grazing permit and 10 sheep units at Oak Springs as allowed from that original grazing permit obtained from his spouse's side, and Defendant shall make any and all necessary arrangements to utilize his dual purpose grazing permit on a yearly rotating basis of six months at or near his birthplace near his mother's customary grazing area and six months at or near the Oak Springs area, and all appropriate authorities shall be notified of the arrangement at the earliest convenience.[1]

---

1. The record does not reflect how this conclusion was reached. While there are provisions in the Navajo Nation Code, 3 N.N.C. Sec. 708, for seasonal grazing, it is limited to Districts 1 and 12. It is not clear whether "rotating basis" means the same as seasonal grazing.

2. In SR-INJ-776-72, the Defendant Raymond Marshall failed to appear and the Court found that sufficient cause had been shown that the Defendant should utilize the said permit according to customary usage of the original permits, mainly on a yearly rotating basis of six months near the disputed area and six months in the Oak Springs area. Mr. Raymond Marshall is the only named Defendant in SR-INJ-776-72. Plaintiff was represented by Charley John.

3. In SR-OSC-181-75, an Order to Show Cause was issued to Mr. Raymond Marshall by Judge Joe Benally on July 25, 1975, which was not served, and by Judge Homer Bluehouse on August 08, 1975, which was served upon Mr. Marshall on the same day.

4. In SR-INJ-776-72, an order for summary judgment contempt and for seizure was issued by Judge Charley John, and it is not clear whether he was counsel for the Plaintiffs previously. On October 19, 1978, Mr. Marshall was ordered to jail for 90 days by Judge Charley John.

5. Judge Perry Garnenez denied Mr. Marshall's motion to correct error on October 24, 1979, ordering that summary judgment remain.

6. In SR-CV-312-84, regarding SR-INJ-776-72, an Order was issued on January 10, 1986 by Judge Harry Brown ordering Raymond Marshall and "all relatives and members of his household" to comply with the permanent injunction issued on December 12, 1974. This is the first time other individuals were named Defendants. Also for the first time, the Court began to specify the area as "all relatives and members of his household who occupy and reside on the customary grazing land of the Plaintiff situated east of Mitten Rock and west of the east wing of the Shiprock peak." The Court further ordered Raymond Marshall and "all relatives and members of his household" to comply with the permanent injunction issued on December 12, 1974 as follows:

a. Not to verbally, physically harass plaintiffs.

b. Not to encroach or trespass upon grazing areas of plaintiffs.

c. Cease any and all construction of buildings or other structures upon the grazing area of plaintiffs.

d. Remove, within 20 days, from the date of this Order, mobile home and any and all other structures erected on the said grazing area of the plaintiffs.

7. A motion for reconsideration was filed and Shiprock District Court Judge Harry Brown denied the motion on February 14, 1986. Mr. Raymond Marshall filed a motion for stay of execution with the Navajo Nation Supreme Court. The Navajo Nation Supreme Court issued an order on March 19, 1986 denying the motion with the following language:

a. Order from which the motion is based confirms the validity of an Order issued on December 12, 1974.

b. Appellant stipulated on January 08, 1988 that he failed to comply with the December 12, 1974 Order and he had been found in contempt.

c. No bond was deposited by Appellant Marshall to protect interest of the Appellees.

d. It is not in the best interest of the judicial system to delay a valid order.

8. This Order was followed with a memorandum decision issued on May 05, 1986. In this decision, the Navajo Nation Supreme Court stated:

> The Appellant's argument that because the customary use area referred to in the injunction is not described by boundaries, therefore the injunction should be vacated, is without merit. The parties know the area is disputed and the injunction enjoins the appellants from encroaching and constructing on the disputed area. The appellants are imputed with knowledge of the disputed area, therefore specifying boundaries in the injunction is unnecessary. Should the parties desire further clarification, then the District Court is the proper forum for that purpose only. The District Court has discretion to clarify that issue without invalidating the permanent injunction.

## FORCIBLE ENTRY and DETAINER and MOTION for INJUNCTIVE RELIEF

This action came to this Court as a Forcible Entry and Detainer Action. This action is based totally upon the Permanent Injunction entered on December 12, 1974. While it is the intent of a Forcible Entry and Detainer action to be swift and immediate, this Court, while reviewing the record in its entirety, finds the case has a history plagued with disparity. In order to do justice, this Court has carefully reviewed the record.

In *Malone v. Yazzie*, 7 Nav. R. 88 (1994), the Navajo Nation Supreme Court decided a case involving an on-going dispute over a grazing permit and a home-site lease. The Court stated:

> A review of the record reveals broader issues than what was originally presented to the Court. The dispute over the homesite lease and grazing permit is a part of a bigger dispute between the parties on appeal, and others, concerning use rights to the land. A decision on the issues of the grazing permit and the homesite lease alone, will not settle the entire matter. For that reason, we believe that the bigger dispute concerning the various parties' alleged interests in the land must be decided before the grazing permit and homesite lease issues can be resolved.

*Id.* at 89. Such is the case here. The Forcible Entry and Detainer request relies upon the Supreme Court's decisions regarding the Shiprock District Court's decisions of December 12, 1974 and January 10, 1986.

This Court will not consider whether the December 12, 1974 and the January 10, 1986 decisions are valid. The Supreme Court found them valid and entered a decision based upon their validity. The December 12, 1974 decision does the following:

> Defendant (Raymond Marshall as of December 12, 1974) was restrained from any verbal, physical harassment including bothering and molesting the Plaintiffs and relatives.

> Defendant was restrained from interfering with or encroaching upon the grazing rights of the Plaintiffs.
>
> Defendant was also restrained forever from trespassing onto Plaintiffs' customary grazing use area, and shall immediately cease any and all attempts at constructing any buildings upon Plaintiffs' customary grazing area.
>
> Defendant also was ordered to remove trailer house, any and all related structures, and any and all equipment from the present disputed area, at the earliest convenience to any location near his mother's customary grazing area, provided he shall obtain all proper permission and consents before relocation.
>
> Finally, Defendant was ordered to abide by any and all established grazing and homesite regulations, and he shall make all necessary arrangements with the appropriate authorities.

In the January 10, 1986 order, the Supreme Court found essentially the same provisions as those set out in the December 12, 1974 order. Upon careful review of the two orders, the injunction issued on January 10, 1986 expanded the parties upon which the December 12, 1974 permanent injunction applies to "all relatives and members of his household." Also the area which is subject to dispute was narrowed in description as "customary grazing land ... situated east of Mitten Rock and west of the east wing of the Shiprock peak," otherwise referred to as map "O." The map is not described in detail. The area is excessive, containing about nine townships. Each township is about 36 square miles, each square mile containing 640 acres. Thus, the area referred to in map "O" is excessive, approximately 23,040 acres.

The January 10, 1986 order was the subject of a motion for reconsideration which was denied on February 14, 1986. At that time, the Shiprock District Court addressed the issue of including other members of the household and relatives by stating that Raymond Marshall and his family have known for many years of the Court's decision. Stated the Court;

> Rule 18 of the Rules of Civil Procedure provides that an injunction is binding on the parties *and* on those with actual notice by personal service *or otherwise*.
>
> The general rule is that one is bound by an injunction even though he is not a party to the suit, therefore, if he has notice or knowledge of the injunction and is within the class of persons whose conduct is intended to be restrained, or acts in concert with such a person. 42 Am. Jur. 2d. *Injunctions* Sec. 320.
>
> Actual joinder of the family members was not necessary.

The Supreme Court, in its May 5, 1986 order, also responded to the issue of vagueness raised by the Defendants.

> The injunction has been in effect for 11 years. This Court is unpersuaded that after 11 years, the appellants have finally become aware that the injunction is

vague. Instead we interpret inactivity for 11 years as an acquiesce by the appellants with the terms of the injunction.

The appellants (Defendants herein) argued to the Supreme Court that "because the customary use area referred to in the injunction is not described by boundaries ... the injunction should be vacated." To this the Supreme Court stated:

> The parties know the area in dispute and the injunction enjoins the appellants from encroaching and constructing on the disputed area. The appellants are imputed with knowledge of the disputed area, therefore specifying boundaries in the injunction is unnecessary. Should the parties desire further clarification, then the District Court is the proper forum for that purpose only. The District Court has discretion to clarify the issue without invalidating the permanent injunction. May 5, 1986 Order at 3.

With this brief history, this Court will address the charges set out by the Plaintiffs in this case. The parties summoned to the hearing are Raymond Marshall, Lawrence Marshall, Alice Lee and Rose Taliman as respondents. Each of these persons was charged by the Plaintiffs as follows:

> That without authority or without the consent of the Plaintiffs, the Defendants have occupied and controlled the established customary grazing use area of the Plaintiffs.

> That the Plaintiffs have made repeated demands for the Defendants to comply with the Court Orders to quit and vacate established customary grazing use area set out as Exhibit O and these demands have been totally ignored.

> Defendants are illegally holding over and they occupy and control the land.

> Defendants have publicly announced at the District Grazing Committee meeting and at the Red Valley Chapter meetings they do not intend to comply with any Court Orders.

> Defendants continue to graze their livestock in excess of their permit and build homes.

Raymond Marshall was specifically further charged with the following:

> Raymond Marshall deliberately damaged a well and water supply used by Plaintiffs and other members of the community by breaking off the shut-off valve which is maintained by the Navajo Nation Water Department.

> Raymond Marshall and all members of his family have repeatedly threatened, harassed and intimidated the Plaintiffs and their family members by "gestures and word of mouth."

The Plaintiffs are further requesting that this Court enter permanent injunctive relief restraining Defendants from further threatening, harassing, intimidating and making physical contact with the Plaintiffs and members of their families,

employees or representatives, and from causing bodily injuries to their persons or to their properties, including livestock.

A hearing was held on October 12, 1995, at which time Raymond Marshall, Lawrence Marshall, Rose Taliman and Alice Lee appeared and presented testimony. Also present were Plaintiffs Marshall Tome, Harry Tome and Kenneth Benally who also presented testimony.

## DECEMBER 12, 1974 PERMANENT INJUNCTION

In order to see if the permanent injunction of December 12, 1974 was violated, this Court had to review the alleged violation in each of the Defendants' cases in light of the testimonies and evidence submitted to this Court.

Since this matter was brought to Court on a Forcible Entry and Detainer, this Court must look to 16 N.N.C. Sec. 1803. 16 N.N.C. Sec. 1803 requires that the complaint contain a description of the premises of which possession is claimed in sufficient detail to identify them, and that the complaint shall also state the facts which entitle plaintiffs to possession and authorize the action. It is the December 12, 1974 permanent injunction and other subsequent orders which are the basis of the Forcible Entry and Detainer Action. Despite the requirements of section 1803, the Plaintiffs did not describe in sufficient detail the premises. It does not appear that a description was submitted to the Court until the filing of the complaint for Forcible Entry and Detainer. In fact, the courts previously entered orders without description of the land in dispute. The complaint in this present case alleges that Defendants have been demanded to quit and vacate the established customary grazing use area of the Plaintiffs and as supporting document, the Plaintiffs submitted the map described as "Exhibit O."

At the hearing, the Plaintiffs testified to the area they claimed. Plaintiffs are claiming an area which appears to overlap with an area claimed by other permittees. In addition, the land claimed by Plaintiffs encompasses a settlement from which the Defendants, except Alice Lee, were removed pursuant to the December 12, 1974 Order. Ms. Lee testified they were born and raised at that settlement. It is disputed that this settlement is the area in which Alice Lee's father had a grazing permit and it may be the area described as Defendant's birthplace.

This Court is required to make a decision on whether Defendants' Forcible Entry and Detainer should be granted. The Plaintiffs allege that Raymond Marshall, Lawrence Marshall, Rose Taliman, and Alice Lee occupy and control the established customary grazing use area of the Plaintiffs to the detriment of the Plaintiffs, that the Defendants continually hold over, occupy and control land, that Defendants defy the orders of the court by controlling property to the exclusion of Plaintiffs, that the Defendants have publicly announced at the Grazing Committee meetings and the Red Valley Chapter meetings that they do not

intend to comply with any court orders, and that the Defendants continue to graze their livestock in excess of their permits and build homes and other structures without homesite leases. Plaintiffs are further alleging that Raymond Marshall damaged the well and water supply used by the Plaintiffs by breaking the shut-off valve causing water waste. Finally, Plaintiffs allege that Raymond Marshall and all his family members repeatedly threatened, harassed and intimidated Plaintiffs by gestures and by "word of mouth."

## TESTIMONY TAKEN BY THE COURT

### Mr. Raymond Marshall

Raymond Marshall testified as follows: Raymond Marshall has moved off the area alleged as Plaintiffs' customary grazing area about five/six years ago. Mr. Marshall presently lives about three miles off the highway and he has lived there for five years as of March 07, 1995, and he lives there alone with his wife. Mr. Marshall testified that while he obtained approval for a home site lease from the chapter, the homesite lease has not gone through the process to obtain the chairman or Bureau of Indian Affairs (BIA) approval as it has been held up because of the dispute. Mr. Marshall testified that while he is off the disputed area, the boundary line is close to where he presently lives and that the boundaries are not clear.

Mr. Marshall also testified that he keeps twenty (20) head of sheep and thirty (30) head of goats and five (5) cows and that he sells them periodically, and the total herd size regularly decreases.

Mr. Marshall indicated he goes through the disputed area almost daily as there is a road in that area open to the public. He further testified that there is a water well in the disputed area where the livestock drink water and that he keeps his livestock within the area where he presently lives. He stated that there is a windmill in the disputed area which pumps water and that there is no other water in the area and that the water is for use by local people and that the other closest water well is about four miles away.

Mr. Marshall also testified that he does not harass or threaten any of the Plaintiffs and that he does not see them and that neither Marshall Tome nor Kenneth Benally live in the area. He stated that when he does meet any of the Tomes, they ignore one another.

Mr. Marshall testified further that while he is limited to twenty (20) sheep units, the sheep units of his livestock periodically reaches a total of seventy (70). However, he keeps the size down by selling his livestock regularly. He also indicated that his children have a grazing permit for ten (10) sheep units and that he has kept his son, Lawrence's livestock, which are two (2) horses. He stated that these livestock graze in the area and that they sometimes go into the disputed area. He was asked that if the boundary was fenced in, would he like it? He stated that he would like it, "... but if I fenced it in, I would get blamed again if I

approved it myself and if the people from the area want a fence, its up to them — if they say so, it's okay; a lot of people live here, many are related to me, my brothers and sisters (clanwise)."

Mr. Marshall also testified that his son, Lawrence, lived in Oaksprings and has lived there since 1990. He also testified that Alice Lee still lives on the disputed land and that she has a few head of sheep which are corralled in, and that she has no cows and no horses. Mr. Marshall also testified that Rose Taliman is his daughter and she resides in Oaksprings and that she moved to Oaksprings after their family members were asked to leave.

Mr. Marshall has cows which are all red except one with a white face. He testified that the earmarks identified by Mr. Harry Tome are not his and that the cows in the photo, submitted to the court as Exhibit Q, are not his cows and that they belong to someone else. He stated, "Mine are fat, these are skinny."

When asked specifically about where he was between 8:00 and 9:00 o'clock A.M. on August 27, 1995, Mr. Marshall stated he did not remember. When told that he was blamed for shooting a gun in the helium plant area, Mr. Marshall stated he was not there shooting a gun and that he has "not shot a gun in quite a while." He further stated that he does own a "30-30" and had used it previously to shoot at coyotes. However, he testified that a long time ago he did chase a coyote into the helium plant area, but he stated, "Harry knows that, that it was not recent."

### Mr. Lawrence Marshall

Mr. Lawrence Marshall testified that he lives three miles north of the trading post in Oaksprings and that he has lived there for over four years. Prior to that time, he lived at Mitten Rock where there is the land dispute at subject in this case. He stated that he has a grazing permit for ten (10) sheep units and that he has five (5) horses of which two (2) are kept at his father's present living area and three (3) are at Oaksprings. He further stated that he has sold all of his sheep. He testified that before he sold his sheep he did keep them at his father's area. He also testified that he has two horses and six cows at his father's area, and that the brands he uses are Q/AC and UDP RQ.

He testified that he did not harass or use abusive language to the Plaintiffs and that he does not visit them and that they do not talk to one another.

He stated he lives at Oaksprings and would like to live near his father at his present living site. He further testified that Rose Taliman is his older sister and that she does not have any livestock. When asked if Rose Taliman had a horse trailer, Mr. Marshall stated he did not think she had a horse trailer. However, when he was asked if Rose owned a house trailer (mobile home) he testified that she did and that the house trailer (10 x 40) was parked at Mr. Raymond Marshall's present living area, off the disputed area. He also testified that his father has the following vehicles: a 1972 brown and white pick-up, a 1984 silver van, a 1978 or 1976 brown and white car and 1980 white Ford car.

## Mrs. Rose Taliman

Mrs. Taliman testified as follows: She lives in Oaksprings outside the disputed area and that she moved there in 1970 when they were "chased out." She stated that her trailer is still parked at her father's living area. Mrs. Taliman stated that all the windows to her trailer have been broken and the door has become loose and the trailer has no wheels. She also stated that she lived in low-rent housing in Shiprock prior to moving to Oaksprings. She stated she does not own any sheep, horses, or cows.

She testified that she did not harass or threaten the Plaintiffs. Rather, in July 1989, she stated that Marshall Tome came at her with a car while she was on the grazing area and that she went to her father's place. No witnesses were presented to support this. She stated that she does not bother the Plaintiffs and allegations of harassment and threats by her are not true. Mrs. Taliman stated she did not do "what I am being blamed for; it's not right." When asked by Plaintiffs' attorney whether or not she was thinking of moving back to her father's present living area, she stated in Navajo that the area from which she was removed is where her footprints start. She stated that she visited with her parents often and that she would like to live near her parents.

## Mr. Harry Tome

Plaintiff Harry Tome testified as follows: That he lives at Mitten Rock and that his parents lived there and that he lives 1/4 mile from the paved highway (M-13 -BIA). Mr. Tome referred to Map O which was introduced into evidence for limited purposes of discussion and not for the truth. Mr. Tome testified that the area described as the disputed area is "our assigned grazing area" belonging to him, Marshall Tome and Kenneth Benally. No testimony was presented to support the assignment.

Mr. Tome testified that the area was designated by his father and mother and that the area is identified as .0681, based upon a permit which was not introduced as evidence.

Mr. Tome stated that besides his family, Alice Lee still resides on the disputed area and he sees her and her family everyday. He also testified that she lives in a little house and that her children are constructing another home. Mr. Tome stated that when his cows go into the area where Alice Lee lives, he goes to get his cows and he sees their housing structures.

Mr. Tome described a small house and another structure being built. He stated that there is also a sheep corral and altogether there are three (3) structures. Mr. Tome further testified that Alice Lee does own livestock, eleven (11) last year and nine (9) at the time of the hearing. Mr. Tome also testified that Alice Lee does not have cows or horses.

To support this testimony, Mr. Tome introduced into evidence pictures his brother, Marshall Tome, took of some livestock he claimed belonged to Alice Lee.

Mr. Tome does not know why Alice Lee has not moved off and he testified that he wants her to move off the land.

Mr. Tome further testified that Mr. Raymond Marshall goes north into the area where the Tomes' livestock graze and sometimes he takes his sheep to the water area. Mr. Tome described Mr. Marshall's cows as red, gray (white) and black. When asked about Mr. Marshall's brand, Mr. Tome stated that he was not aware of Mr. Marshall's brand but that Mr. Marshall tells the grazing committee at roundup that he has a brand. Notwithstanding this, Mr. Tome stated he knows which cows belong to Mr. Marshall and that he sees these cows at the water area at least once a week and that Mr. Marshall drives them home.

Mr. Tome further testified that he is aware of eleven (11) cows which belong to Mr. Marshall. He also introduced pictures which he claims are pictures of cows belonging to Mr. Marshall. Mr. Tome stated he knows these cows belong to Mr. Marshall based upon the cut of the ears. However, when cross-examined regarding the earmarks, Mr. Tome stated he knew the earmarks belong to Mr. Marshall because when they go to get water "I see them, they are like that." When asked if he knew the Marshall brand, Mr. Tome stated, "No, I don't know that."

Mr. Tome also submitted to the Court pictures of houses he claimed belong to Mr. Marshall. Mr. Tome further testified the pictures of the livestock were taken within the disputed area.

Mr. Tome also testified that he attended a school board meeting in Red Valley and while he was there making a school board report, he was harassed and threatened. He further testified that at chapter and Grazing Committee meetings, since 1990, he was harassed and threatened several times in a row. All in all, he claims he was harassed and threatened a total of (16) sixteen times since 1990, up to a week before his testimony. Mr. Tome did not specify what was said or by whom other than to state, "they talk about us; he is like this and he chased us off our land and up to this day he is not sympathetic." Mr. Tome indicated that Raymond Marshall and Rose Taliman made such statements. Mr. Tome further stated that at the District Grazing Committee meetings "they say they (Tomes) killed cows and sheep."

Mr. Tome testified that "they don't really say how they would harm me, but they call me a liar, a cheat." Mr. Tome testified that Mr. Marshall does not speak to him with respect and that Mrs. Taliman at school board meeting stated "you are like this, you are not kind to people, you are like that, you are difficult." The school board had to close the meeting because she created a disturbance. Since 1990, she has done this about (6) six times and these incidents occurred outside the Red Valley Chapter House. While Mr. Tome testified to the above, no witnesses were presented to support this testimony.

Mr. Tome stated that sometimes when he goes after the sheep, he can hear people yelling at him. He also stated that Rose Taliman has made gestures at him with her fingers. Mr. Tome stated that he knows Rose Taliman is the one who yells because she would be close by in a car. When asked about her vehicle, Mr.

Tome stated that Mrs. Taliman would drive different vehicles and he would see her driving the different pick-up trucks.

Mr. Tome stated that in the most recent occurrence, he recognized Rose Taliman and claimed her children talked awful to Mr. Tome's worker and that they were driving a red and white truck. There was no testimony as to what was actually said.

Mr. Tome also testified that at the election campaign meetings they said "let's do this to him." (It is not clear as to what would be done.) Mr. Tome stated he did not hear Mr. Marshall say this and he stated Rose Taliman was there. Mr. Tome stated he was not harmed physically by anyone.

He also testified that on July 18, he became aware of damage to the shut-off valve and stated "his workers (Tome's)" had taken it apart. Mr. Tome stated that the one who damaged the shut-off valve was Raymond Marshall, as "his car tracks were there." When asked if Mr. Raymond Marshall used the water, too, Mr. Tome stated, "Yes, he's the one who broke it down."

Upon cross examination, however, Mr. Tome did state that people other than Mr. Marshall lived in the area and their livestock also come into the disputed area to water.

### Mr. Marshall Tome

Mr. Marshall Tome testified as follows: Mr. Tome stated that he took the pictures marked as Exhibits P, Q and R, and that they are pictures taken in the disputed area on October 05, 1995. In Exhibit P, Mr. Tome testified that the picture represented a structure in Alice Lee's living area. In Exhibit Q, Mr. Tome testified that the picture represented Raymond Marshall's cows along side the road. Mr. Tome stated he did not see any brand but "we just know it (sic) is (sic) their cows." In Exhibit Q, Mr. Tome testified that the picture represents Raymond Marshall's house, outside the disputed area. Mr. Tome also testified that Exhibit S represents another picture of Marshall's houses, again outside the disputed area. Mr. Tome testified that Rose Taliman's trailer is also shown in the picture, also outside the disputed area.

### Mr. Kenneth Benally

Mr. Kenneth Benally also testified. He is a Plaintiff and a brother to both Harry and Marshall Tome. Mr. Benally testified that on August 26, 1995, his little brother's son, Jeff Tome, called him asking him to help brand calves and that on August 27, 1995, on a Sunday, they agreed to meet at the windmill after "splitting" up to get cattle. Upon splitting up, Mr. Benally testified that he went around the road, staying on the tracks, because it rained on Saturday night. Mr. Benally stated, "I left my truck there and I started to herd cattle on foot and then I was going east toward the helium plant and I saw a pick-up truck parked along the road." Mr. Benally stated that he heard shooting which sounded like a .22 pistol

or a .22 rifle and he stated it didn't bother him as he figured it was someone target practicing. Mr. Benally further testified as he herded the cattle past the pick-up truck, he continued to hear the shooting. When asked which way they were shooting, Mr. Benally stated "I don't know which way they were shooting, I know if it was shot at me. I can sense it, but it wasn't." Mr. Benally stated he then went back to his own car and said, "I'm going to find out who the heck that is shooting around, shooting at what." At which point, he testified he got back into the car and drove off. He stated he recognized the pick-up truck which was tan and off-white with a little darker color on the side.

Having forgotten the brand, Mr. Benally testified that he went back to Harry's house and on the way back, he saw Raymond Marshall driving the same pick-up truck and that they passed each other, "I was going west and he was coming east on the roadway." When asked if it was the same pick-up from which he heard shooting, Mr. Benally stated, "I don't know what the motive was - trying to scare me or what. I don't have any idea." Mr. Benally stated he heard about nine shots. When asked if he was ever harassed or threatened by Mr. Marshall, Mr. Benally stated, "just from what I am told."

When asked about the road, Mr. Benally stated there are trails in the area and that the road/trails upon which he was driving led to the helium plant and that one road/trail led right down toward Alice Lee's home. Mr. Benally also testified that he is quite knowledgeable about guns and the sounds of guns, as he served in the military for four and half years ($4\frac{1}{2}$) years and the shots he heard were from either a .22 pistol or a .22 rifle.

### Mrs. Alice Lee

Alice Lee testified that she is married to Paul Lee, Jr. and that she has nine children and that her husband retired from the BIA in April, 1995. Mrs. Lee testified that she lives on the disputed area in a one-bedroom house which she has lived in for a very long time and that it belonged to her mother and father who are deceased. Her father, Marshall Hathalie, died 28 years ago (as of October 1995) and her mother, Lucy Hathalie, died 18 years ago (as of October 1995). Mrs. Lee testified that Raymond Marshall is her older brother. When asked whether her parents lived anywhere else, Mrs. Lee stated, "just right there," referring to her present site. Mrs. Lee stated she was born, raised, and nurtured there and that she did not go to school. Mrs. Lee stated in Navajo, "We were raised there. Right there we bonded to the land."

Mrs. Lee stated that a house with three bedrooms was built in 1986. However, the house lacks electricity and water because of the problem regarding the dispute. Therefore, no one lives in the house. The Tomes have put a "stop to it" because of the dispute. In addition, there is a third structure on the land where she dwells, a house being built by her children.

Mrs. Lee stated, in addition to the three dwelling structures, there are two sheds for storage, two old cars, which belong to her son, and a narrow sheep pen,

about twenty feet long, in which she keeps nine sheep. Mrs. Lee stated she has a grazing permit for sixty-nine (69) sheep units, which she got from her husband, for an area six to seven miles from where she presently lives. Mrs. Lee stated she does not have any cows, horses or goats.

Alice Lee appeared *pro se* and upon hearing testimonies and receiving photographs, this Court finds that Alice Lee, who is a sister to Raymond Marshall, was not initially named as a party to the ongoing case until the 1995 summons, the subject of this case.

Mrs. Lee testified in her closing statement that she has a grazing permit for the area she now lives on. She stated she was told to take care of the land and that she is 60 years old as of October 1995 and that, by clan, the Plaintiffs are her older brothers.

## ISSUES TO BE ADDRESSED

The following issues need to be addressed:

1. Whether each of the Defendants is out of compliance with permanent injunction and subsequent order as charged by the Tome brothers so as to be guilty of Forcible Entry and Detainer.

2. Whether the land upon which Alice Lee presently resides and upon which her siblings and parents resided were ever part of the area subject to claim by the Plaintiffs.

## COURT'S FINDINGS

### Raymond Marshall's Occupation and Control of Area Claimed by Plaintiffs; Harassment; and Water System Damage

Mr. Raymond Marshall demonstrated to this Court that he does not live on the disputed area claimed by the Plaintiffs. This Court does not find that Mr. Raymond Marshall occupies and controls the established customary grazing area claimed by the Plaintiffs. This Court does not find that Mr. Raymond Marshall continues to illegally hold over, occupy and control land to the exclusion of the Plaintiffs. All of the Plaintiffs testified they have access to the area. Further, there has been no showing that Mr. Marshall has publicly announced that he would not comply with the Court orders.

While Mr. Harry Tome testified about having been harassed and threatened, he could not say whether Mr. Marshall made any specific statements nor could he pinpoint where these statements were made. He merely stated that "they talk about us, he is like this and he chased us off our land and up to this day he is not sympathetic," referring to what was said about him. No witnesses to corroborate his statements were brought before the Court. Furthermore, when asked specifically about how the Plaintiffs were harassed and threatened, Mr. Tome stated,

"they don't really say how they would harm me, but they call me a liar, a cheat."

As to Mr. Marshall's role, Mr. Tome made general statements such as he knows that Raymond Marshall and Rose Taliman make statements. Mr. Tome further testified that Mr. Marshall does not speak with respect and that Mrs. Taliman, at school board meetings, says "you are like this, you are not kind to people, you are like that, you are difficult," and that the school had to close meetings because of the disruption. Again, no witnesses were presented to corroborate these statements.

Mr. Tome did testify that on an election campaign, "they" said, "lets do this to him." (It was not clear who "they" were and what would be done.) However, Mr. Tome stated he did not hear Mr. Marshall say this.

Mr. Kenneth Benally did testify that Mr. Marshall was shooting a gun in the helium plant area on or about August 27, 1995. On one hand, Mr. Benally stated that upon hearing gunshots, he was not bothered as he figured it was someone target shooting. On the other hand, he indicated he was bothered when he saw a truck which he testified belonged to Mr. Marshall and when he realized it was Mr. Marshall driving the truck. When asked if it was the same pick-up from which he heard shooting, he stated "I don't know what the motive was - trying to scare me or what. I don't have any idea." To this Mr. Marshall stated he does not remember what he was doing on August 27, 1995 between 8:00 to 9:00 o'clock a.m., but that he was not at the helium plant area shooting guns. Stated Mr. Marshall, "I have not shot a gun in quite a while." Mr. Marshall admitted to owning a 30-30 which he used previously to shoot at coyotes. He also admitted that he did chase a coyote into the helium plant area, but it was a long time ago, and he stated "Harry knows that." Mr. Benally, on the other hand, claims to be very knowledgeable about guns and the sounds they make. Mr. Benally testified that the shots he heard were from a .22 pistol or rifle. No witnesses were produced to support either Mr. Benally or Mr. Raymond Marshall. This Court is satisfied that Mr. Raymond Marshall was not shown to have harassed or threatened the Plaintiffs as alleged by the Plaintiffs. This Court also finds that Mr. Raymond Marshall has not built any structures in the disputed land area.

Furthermore, this Court is not satisfied that Mr. Marshall deliberately caused extensive damage to a well and water supply by breaking the shut-off valve. While Mr. Tome testified that Mr. Raymond Marshall's tire tracks were there, there were no witnesses or evidence submitted to support that allegation.

Mr. Tome further testified that other people also use the water well. While no evidence was presented regarding the well being private property of the Tomes, it was made clear to the Court that the Navajo Nation maintained the well, contradicting that the well is in the Tome's sole use, exclusive to other users, including Mr. Marshall.

Mr. Marshall did admit to periodically exceeding the sheep units allowed on his grazing permit. Furthermore, Mr. Marshall also admitted that his livestock roam into the disputed area in order to obtain water from the windmill which he

believes is public. No permits were submitted to this Court to either support or to counter either the Plaintiffs' or the Defendants' claim.

### Mr. Lawrence Marshall's Occupation and Control Over Area Claimed by Plaintiffs to the Detriment of Plaintiffs; Harassment; and Water System Damage

This Court is satisfied that Lawrence Marshall has moved from the disputed area and that Lawrence Marshall does not occupy and control the established customary grazing use area to the detriment of the Plaintiffs. This Court is further satisfied that Mr. Lawrence Marshall does not continually hold over, occupy and control land.

Furthermore, this Court is satisfied that Lawrence Marshall has not defied the Court order by controlling property to the exclusion of the Plaintiffs. There is no showing that Lawrence Marshall announced publicly at a District Grazing Committee meeting and at a Red Valley Chapter meeting that he does not intend to comply with the Court orders.

Mr. Lawrence Marshall did testify that he has six (6) cows and two (2) horses which were at his father's house as of the date he testified. Mr. Raymond Marshall testified that he has a grazing permit for twenty (20) sheep units and that his son, Lawrence Marshall, has a grazing permit for ten (10) sheep units.

The Plaintiffs have pointed out that because Mr. Lawrence Marshall's livestock graze and water in the disputed area, they are in violation of the December 12, 1974 order and subsequent Court orders and, therefore, the Court should sanction them. In addition, the Plaintiffs allege that the Marshalls are in violation of the orders because the number of sheep units are in excess of the permits. This is included as an item for discussion below.

### Mrs. Rose Taliman's Occupation and Control of Area claimed by Plaintiffs; Harassment and Water System Damage

This Court finds that Rose Taliman has moved off the area claimed by the Plaintiffs and that she does not occupy and control the area to the detriment of the Plaintiffs. Nor does this Court find that Rose Taliman illegally held over, occupied and controlled the claimed area to the exclusion of the Plaintiffs.

Plaintiffs' charge that Rose Taliman publicly announced at the District Grazing Committee meetings and the Red Valley Chapter meetings that they (the Marshalls) do not intend to comply with any Court orders. Plaintiffs also charge that she has repeatedly threatened, harassed and intimidated Plaintiffs and family members by gesture and by word of mouth. Rose Taliman denied she has harassed or threatened the Plaintiffs. The only question raised by the Plaintiffs' counsel was "you told us you don't use abusive language" to which Rose Taliman answered "yes." Rose Taliman was not questioned regarding her alleged role in the harassment, intimidation and threatening charges by the Plaintiffs, which were alleged to have taken place at the chapter meetings, grazing meetings and school board

meetings. No other witnesses were produced to support the allegations.

Likewise, Ms. Taliman was not asked about her alleged finger gesture, Thus, this Court is not satisfied that Ms. Taliman did harass, intimidate or threaten the Plaintiffs.

### GRAZING and WATERING LIVESTOCK on DISPUTED AREA

This Court finds that livestock belonging to both Raymond and Lawrence Marshall do periodically graze and water on the disputed area. Alice Lee does live in the area claimed by the Plaintiffs. Mrs. Lee also admitted to having nine head of sheep on her living site, which is located on the area presently disputed.

The December 12, 1974 Order recites the following regarding the grazing permits of Mr. Marshall. Stated the Court in its findings at four and six:

> 4. That the Defendant [Mr. Marshall] has a grazing permit for 30 sheep units, 20 sheep units near the disputed area and 10 sheep units from the Oaksprings area and sufficient cause has been shown that the Defendant should utilize the said permit according to customary usage of the original permits. Mainly on a yearly rotating basis of six months on the Oaksprings area.

> 6. That the Defendant should move the trailer house and other structures which are presently located on Plaintiff's customary grazing area to a location near Defendant's mother's customary grazing area, provided he does so with permission.

In the same order, the Court further stated:

> It is further ordered, adjudged and decreed that the Defendant shall abide by any and all established grazing and homesite regulations, and he shall make all necessary arrangements with the appropriate authorities, to graze his allowable sheep units of 20 sheep units near his birthplace as allowed pursuant to his father's grazing permit and 10 sheep units at Oaksprings as allowed from that original grazing permit obtained from his spouse's side, and Defendant shall make any and all necessary arrangements to utilize his dual purpose grazing permit on a yearly rotating basis of six months at or near his birthplace near their mother's customary grazing area and six months at or near the Oaksprings area, and all appropriate authorities shall be notified of this arrangement at the earliest convenience.

Since this Court Order and the January 10, 1986 Court Order are valid, the present cause of action must be received in light of these Orders. This Court will look first to the December 12, 1974 Order to determine whether there were any violations of the permanent injunction presently in place regarding grazing and use of the water well.

Mr. Lawrence Marshall did admit to having two (2) horses at his father's present living site. According to testimony given by Mr. Raymond Marshall, the livestock which are under his care do roam onto the disputed area in order to water at the well.

The January 10, 1986 Order and the subsequent Orders exclude the language set out in the December 12, 1974 Order regarding Mr. Marshall's father's and mother's grazing area. The latter altogether refrains Mr. Marshall and relatives from encouraging and/or trespassing upon the grazing area of the Plaintiffs. This Court is charged with reviewing the orders and the testimony given.

While the Court Order dated December 12, 1974, indicates that Mr. Raymond Marshall does have a permit for 20 sheep units near the disputed area, it does not specify how near. Nor does it specify whether, if indeed Mr. Raymond Marshall has a sheep permit on the disputed area, he would be allowed to graze his livestock in the area, including the area claimed as customary use area by the Plaintiffs. The order also does not specify whether the windmill is for Plaintiffs' exclusive use or whether it is one set up for all people in the area including the Marshalls and the Lees.

The December 12, 1974 Order allows Mr. Marshall to graze his 20 sheep units near his "birthplace as allowed pursuant to his father's grazing permit ... and to graze (for six months) at or near his birthplace near their mother's customary grazing area." Review of the records, testimony and evidence taken by the Court do not clarify where Mr. Raymond Marshall's father's grazing permit allows grazing, where Mr. Marshall's mother's customary grazing area is and where Mr. Marshall's birthplace is, other than testimony given by Alice Lee in which she states that she and her siblings (including Raymond Marshall) were born and raised in the area where she now resides.

Because the record is not clear and the only relevant testimony given was by Mrs. Alice Lee, to the effect that she presently resides on land on which her late parents resided and on which she was born, it can only be presumed that the land on which Mrs. Lee resides may also be the birthplace of the Defendant, Mr. Raymond Marshall. Given this, Mr. Marshall may have rights to graze a limited head of sheep in the area, if indeed the land off which Mr. Marshall was forced is the same and subject to the grazing permit presently held by Mr. Marshall. The December 12, 1974 Order states, "Defendant should utilize the said permit according to customary usage of the original permits." At Item 4 of the December 12, 1974 Order. At Item 6, it further states, "[Defendant] ... shall make all necessary arrangements ... to graze his allowable sheep units of 20 sheep units near his birthplace...." There was no testimony presented in regards to actual grazing permits.

If indeed Mr. Raymond Marshall has a grazing permit in the area and he is one of the permittees in the area having access to the wells established and maintained by the Navajo Nation, then he would not be in violation of the December 12, 1974 Order when his livestock roam onto the area claimed by Plaintiffs as their exclusive grazing right to water.

Mr. Lawrence Marshall did testify that he has previously kept ten (10) sheep and two (2) horses at his father's residence. Mr. Marshall also stated that he has a permit to graze ten (10) sheep units but it is not clear where the grazing area is located for these ten (10) sheep units. In addition, Mr. Marshall stated that he has

five (5) horses, two (2) of which are kept at his father's present living area.

A grazing permit gives one the right to use the land for grazing. Grazing permits are issued utilizing sheep units. However, grazing lands are not limited to sheep alone. Horses and cows may also be grazed. For example, one (1) horse is equal to five (5) sheep units. 3 N.N.C. Sec. 708; *In Re: Mary Ellis Joe's Customary Use Area*, No. SR-CV-949-83. Here, if indeed, Mr. Lawrence Marshall's grazing permit for ten (10) sheep units is within the disputed area, then the two (2) horses kept in the area by his father, Mr. Raymond Marshall, based on the ten (10) sheep units would not be in violation of the December 12, 1974 Order. Nor would such grazing be in violation of the subsequent order, since these orders are based on the December 12, 1974 Order. If, however, the ten (10) sheep units are from an area outside the disputed area, then there may be a violation, depending upon where the ten (10) sheep units area is located. Crossing the disputed area to get to the water well may or may not be a violation, depending upon where the ten (10) sheep units area is located and also depending upon whether the water system was intended for all livestock covering an entire area.

Finally, the December 12, 1974 Order requires the Defendant "to make arrangements to utilize his dual purpose grazing permit on a yearly rotating basis of six (6) months at or near his birthplace near their mother's customary grazing area and six (6) months at or near the Oaksprings area, and all appropriate authorities shall be notified of this arrangement at the earliest convenience." It is not immediately clear as to what this means. It may intend to refer to the equivalent of seasonal grazing, as provided for in 3 N.N.C. Sec. 708.

The law of grazing permits is set out in 3 N.N.C. Sec. 701 *et. seq*. Section 708(c) states, "No person can hold a grazing permit in more than one district on the Navajo reservation." The December 12, 1974 Order would not be in compliance with this section if Mr. Raymond Marshall's permits are for two districts, unless they are considered seasonal grazing permits, pursuant to 3 N.N.C. Sec. 708.

Thus, the December 12, 1974 Order must be read in light of the Navajo law. In effect, the December 12, 1974 Order requires the Defendant to utilize his permit on a rotating basis of six (6) months at or near his birthplace, near his mother's customary grazing area, and six (6) months at or near Oaksprings area. Such order may be lawful only if pursuant to 3 N.N.C. Sec. 708. Presently, it is unclear to this Court whether the subject permit is seasonal. Even if the permits in question are seasonal grazing permits, they must be used in accordance with the law. Thus, use on a rotating basis is valid only so long as Mr. Marshall's permit allows seasonal grazing.

This Court cannot determine whether Mr. Raymond Marshall and Mr. Lawrence Marshall are violating the December 12, 1974 Order based upon the information submitted. It may be argued that the Marshalls are violating the subsequent orders. However, the subsequent orders build upon the December 12, 1974 Order and, therefore, violation allegations must be read in light of the December 12, 1974 Order.

Furthermore, even if we were to assume that Alice Lee was included as a party, as of December 12, 1974, the question remains whether the land upon which she resided then and upon which she resides now is subject to claim by the Plaintiffs. Alice Lee, as a named party, is charged with occupying and controlling the established customary grazing use area of the Plaintiffs' since the entry of the Permanent Injunction of December 12, 1974. Plaintiffs allege that she continues to do so illegally and that despite their repeated demands for Mrs. Lee to comply with the Court Order and vacate the "established" customary use area, she has ignored the demands and continues to illegally hold over, occupy and control said land to the exclusion of the Plaintiffs.

Mrs. Lee testified that she has been living on the land upon which she now resides with her family before and since the death of her parents. Prior to that time her parents resided on the land, as she and her siblings, including Raymond Marshall, were born and raised there. It is not clear as to the exact area on which this family resided upon and used other than the present living site. If indeed Mrs. Lee was born and raised where she now resides, then it is possible that the area upon which Mrs. Lee presently resides was never part of the customary use area presently claimed by the Plaintiffs. Therefore, as of December 12, 1974, the area upon which Mrs. Lee presently resides was never part of the land from which Mrs. Lee can be enjoined or from which she can be removed. It follows that if Mr. Raymond Marshall was also born and raised in the same area, then the area upon which he lived was never part of the customary use area of the Plaintiffs.

Based on this, clearly the land upon which Mrs. Lee continues to reside was never part of the customary use area claimed by the Plaintiffs. For this reason, Mrs. Lee is not illegally holding over. There was no testimony offered by the Plaintiffs to the contrary. Thus, this Court does not find Mrs. Lee to be occupying and controlling land she resides upon to the detriment or exclusion of the Plaintiffs.

While the Plaintiffs' father charged that the Defendants, including Alice Lee, have publicly announced at District Grazing Committee meetings and Red Valley Chapter meetings that they do not intend to comply with the Court Orders, no evidence or testimony was given to show Mrs. Lee was involved. Nor has there been any testimony or evidence given to support the allegation that Mrs. Lee threatened, harassed or intimidated the Plaintiffs.

Mrs. Lee admitted she was born and raised in the area upon which she continues to live, within the area in dispute. This Court is aware, based upon the records and testimony, that Mrs. Lee was named a party for the first time in this Forcible Entry and Detainer action. Thus, although Mrs. Lee was never initially given notice, she was later included as a party. This issue was raised and addressed in the February 14, 1986 Order issued by Judge Harry Brown. Judge Brown stated as follows:

> Although Mr. Marshall may not have standing to raise the issue, service upon the family members of Defendant was not required, in order to issue the Writ of Assistance. Raymond Marshall and his family have known for many years

of the Court's decision. Furthermore, Rule 18 of the Rules of Civil Procedure provides that an injunction is binding on the parties and on those with actual notice by personal service or *otherwise*. At item 6.

The Court then went on to cite 42 Am. Jur. 2d. *Injunctions* Sec. 320.

However, it is not clear to this Court whether the parties included as members of Mr. Marshall's family included Alice Lee as of February 14, 1986. Mrs. Lee indicated to this Court that she was never involved in this matter until four (4) weeks ago as of October, 1995 at which time she was told to pay $100.00. A default judgment can be entered against only persons who have been both properly named as parties and properly served. 46 Am. Jur. 2d. *Judgments* Sec. 277. Even if Alice Lee was a proper party, this Court does not find her in violation of Forcible Entry and Detainer laws.

Based on the above findings, this Court is satisfied that the named Defendants are not in violation of the Forcible Entry and Detainer laws, pursuant to 16 N.N.C. Sec. 1801 *et seq*.

## NAVAJO NATION GRAZING POLICIES

The facts so far presented must be viewed in light of any Navajo Nation policies regarding grazing rights. Thus, this Court, in order to address this continuing problem, must look to the policies of the Navajo Nation regarding grazing. This Court is also required to look to the grazing policies in order to establish boundaries.

In, *In Re: Mary Ellis Joe's Customary Use Area, District 9, Shiprock Agency, Navajo Nation*, No. SR-CV-949-83, the Shiprock District Court judge stated:

> 1. A grazing permit gives one the right to use the land for grazing, however, "no person is entitled to more range area than needed to support the number of livestock allowed on his or her grazing permit" as set forth in the 1957 *Navajo Reservation Grazing Handbook* at page 14. The primary purpose of grazing permits is to control the number of livestock to protect and preserve the land. Mary Ellis Joe testified that she has a grazing permit which allows her to have 83 sheep units. However, according to her testimony, she maintains 150 goats and sheep, 20 cows and 6-7 horses. One cow or one horse is equal to 5 sheep units; therefore, 27 cows and horses would be equivalent to 135 sheep units. May Ellis Joe currently grazes 285 sheep units on a 83 sheep unit permit. Note, under the current poor grazing conditions, she alone needs 17,100 acres to support 285 sheep units on a 83 sheep unit permit. At trial, Mary Ellis Joe alleged that the respondents were responsible for depletion of grass. But, Mary Ellis Joe is also contributing to the poor conditions especially in light of Mr. Randy D. Cornett's testimony that the number of livestock is downplayed by the owners. To exacerbate the situation, there are three other permitters who are allowed 221 sheep units. It is not unreasonable to conclude that these other valid permitters within .0216 are also grazing beyond their limit and thus contributing to the poor grazing conditions in violation of the Navajo land policy.

2. Initially, grazing permits were issued to persons who had livestock and could identify customary use to a specified area. Customary use is a Navajo concept that defines one individual Navajo's prescribed boundary for the use and occupancy of land to an area traditionally inhabited by his/her ancestors. *In the Matter of the Estate of Charley Nez Wauneka Sr.*, 5 Nav. R. 79, 81 (1987). Grazing permits were also issued to those people who claimed a specific area of land known as "claimed use area."

3. A grazing permit is one of the most important items of property a Navajo can own. *Estate of Navajo Joe*, 4 Nav. R. 99 (1983). Grazing permits are extremely valuable property items due to the limited land base and land use rights embodied by the permit.

5. Grazing permits, from their inception have been controversial and fraught with conflict.... [T]he court will ... adhere to the Navajo land policy adopted by the Navajo Supreme Court. The court recognizes that land is a resource and the increasing pressure on the land threatens its viability. Hence, the primary goal of the Navajo land policy is to keep the land economically viable.

The court is forced [to deal] with the extremely difficult and emotional issue of land disputes. Land to the Navajo people is life which embodies the concept of spiritual, mental, physical and emotional well being. Navajo thinking and values accord land with survival and sustenance. Since the Long Walk, Navajos have maintained a subsistence life-style based on livestock production, which livestock ownership among the Navajo is a symbol of wealth, prestige, and stability.

Since the land plays a central and sacred role in the Navajo culture it follows that the Navajo will fight long and hard for their land. Many of the land disputes arising on the Navajo Nation are between common [descendants] and between siblings. The rapid population growth of the Navajos along with a strong cultural tradition of having land with livestock and a home where they grew up inevitably causes land disputes. The Navajo population has increased from approximately 9,000 (upon return from Ft. Sumner) to 169,157 in 1989. See *Chapter Images: 1989, General Facts on Navajo Chapters*, 1990, Larry Rodgers, Division of Community Development, Window Rock, Arizona.

Evidence of the spiritual and mental ties to livestock ownership clearly surfaced when the government forced Navajos to reduce their stock by 64 to 80 percent during the late 1930's and early 1940's. Navajos were devastated by the massive killing and irreverent conduct by government officials. See *Navajo Livestock Reduction: A National Disgrace*, Navajo Community College Press, 1974. The purported purpose of the stock reduction was to restore the land which had been overgrazed by an over abundance of livestock. This era initiated a reservation-wide grazing policy which gave birth to the Grazing Permit in 1937. The majority of Navajos reacted strongly against the regulation of grazing and Grazing Permits, but it was eventually accepted. The maximum amount of permissible sheep units an individual Navajo could receive was set at 350 to be authorized by the Bureau of Indian Affairs.

Unfortunately, when dealing with the ancestral use of the land, we must look to the family tree which gets ever wider with more and more people, who all claim to have use rights by virtue of common ancestors. This is exactly what we are faced with in this case. Petitioner Mary Ellis Joe is the daughter of Hosteen Kitseally's old wife and Respondent Grace Oldman is the daughter of Hosteen Kitseally's new wife. When Hosteen Kitseally separated from his old wife and began to live exclusively with his new wife, he gave his old wife the majority of the sheep and the land to her right as she faced east on top of Toh Atin Mesa. Hosteen Kitseally, with his new wife, moved to the North of Toh Atin Mesa and began to build the herd again. When boundaries are delineated by fences, it is possible Mary Ellis Joe may have grazed at one time or another on the land north of Toh Atin Mesa and further south and west of the .0216 area. But, when such a claim is made, we have to look to the rights of the other descendants of common ancestors in light of the Navajo land policy.

The semi-desert and arid region of Navajoland requires livestock control to protect the land from becoming a wasteland. Although the amount of stock owned by individual Navajos is much less than what it was prior to forced stock reduction fifty-five years ago, the Navajo population has almost quadrupled since the issuance of grazing permits in 1940. See *Navajo Nation FAX 88; A Statistical Abstract*, p. 2, September 1988, Division of Community Development, Window Rock, Arizona. Within Shiprock Agency District 9, the population was estimated to be 2,285 in 1940 and 4,994 in 1980 - an 118.56% increase. It is projected to increase to 6,242 by 1988. See *Navajo Nation FAX, Id.* at p. 7.

The 27,000 acres claimed by Mary Ellis Joe disturbs the court for the following reasons. The estimated land size of Sweetwater Chapter is 152,006,30 acres. Her claim amounts to over one fifth of the Sweetwater Chapter area within District 9. The estimated 1989 Sweetwater population is 1,698. See *Chapter Images* 198, *Id.* at 104. To grant Mary Ellis Joe her claim of 27,000 acres would not only deny the rights of descendants who have been born and raised in the area, but it would grant Mary Ellis Joe a special privilege which is no longer practical or realistic. Almost every middle aged Navajo sheep owner can recall when their families made seasonal herds over great distances and could probably show reminisces of camps upon request. The tremendous increase in population has rendered it inequitable for any one Navajo or family to continue that life-style because in effect, it would force 90 percent of the remaining Navajos to forfeit their identity with the land. It's unlikely that a subsistence life-style entirely based on raising stock is possible because of the massive land base that is required to make it profitable without destroying grazing land.

Although time has changed the extent of subsistence livestock economy of the Navajo people, stockraising today retains its traditional position. Many young educated Navajos trained in various fields have sources of income other than subsistence stockraising. Contrary to what the officials from the Bureaus of Indian Affairs had hoped for forty years ago, many of these

Navajos have inherited the Navajo way of thinking. They maintain ties to the land and value stockraising, even if it is just one sheep, one horse or one cow and return back to where they were raised whenever possible. The BIA believed that the spread of education would de-emphasize stockraising. See *The Navajo Year Book, Report No. viii, 1951-1961, A Decade of Progress*, Robert Young, Assistant to the General Superintendent; Navajo Agency, Window Rock, Arizona 1961.

Petitioner contends that those Navajos who reside and graze in the area she is claiming are responsible for the deterioration of grazing land. Petitioner further contends that given the poor range conditions, the 304 sheep units would require 18,240 acres. This figure is based on the testimony given by Randy D. Cornett, Supervisory Range Agency, Bureau of Indian Affairs. Mr. Cornett estimated that the range condition in the lands in dispute is estimated to be poor north of Toh Atin Mesa and poor to fair in the south. Mr. Cornett stated that given poor conditions, it takes 50-60 acres to graze one sheep unit.

The purpose of the Navajo land policy is to keep Navajoland economically viable. The problem of overgrazing is widespread and each individual Navajo should take responsibility to protect our Nation from becoming a wasteland. This can be achieved by controlling the amount of livestock or give them supplemental feeding or both. This court is not in the position to promulgate rules and regulations that may reconcile customary use claims with grazing permits. Nor is this Court responsible for the enforcement of grazing regulations. This Court suggests to the lawmaking body to create a competent administrative agency to hear and determine land disputes. That Navajo Nation administrative agency can promulgate procedures which guarantee due process and rights guaranteed by the Navajo Bill of Rights and Indian Civil Rights Act.

### JUDGMENT

Mary Ellis Joe will be not be allowed to claim more land than could have been claimed by her mother Kitseally's old wife. The original 1940 Bureau of Indian Affairs map of the area in dispute shows that Kitseally's old wife had a customary use area designated as .0216 as shown on Petitioner's Exhibit "1." This will be the land allowed to be claimed by Mary Ellis Joe.

The Navajo Nation policies set out so eloquently in *In Re: Mary Ellis Joe* remain intact. For this reason, this Court is interested in establishing some boundaries as recommended by the Navajo Nation Supreme Court in the May 5, 1986 Memorandum Decision. In so doing, this Court, in a separate order, shall appoint two (2) fact finders to look into this matter.

This Court is interested in grazing permits held by families within the disputed area. This Court is also interested in the number of sheep units per permit and the customary land use as claimed by the petitioners in light of other permitters in the area, including the Lees and the Marshalls.

The Court is also interested in the following:

a. How long have the Lees and Marshalls lived in the area prior to the initial petition and how long did Alice Lee's parents live in the area and how did the parents use the land?

b. What areas did Mrs. Lee's parents use previously?

c. Whether at the time the injunction was issued, what land upon which the Marshalls and Lees lived was occupied and used outside any claim by petitioners?

Finally, the Court is also interested in addressing the concerns expressed in *In Re: Mary Ellis Joe*, that "no person is entitled to more range area than needed to support the number of livestock allowed on his or her grazing permit" and that the rights of other descendants of common ancestors must be reviewed in light of the Navajo land policy.

In summary, the Respondents, Raymond Marshall, Lawrence Marshall and Rose Taliman, are found not to occupy and control any customary grazing use area of the Petitioners. Nor does this Court find Mr. Raymond Marshall, Lawrence Marshall and Rose Taliman to be illegally "holding over." This Court is not satisfied that any of the Respondents have publicly announced at District Grazing Committee and Red Valley Chapter meetings that they do not intend to comply with any court orders.

Furthermore, this Court is not satisfied that Mr. Raymond Marshall deliberately damaged a well and water supply used by Plaintiffs and others. There is no showing to the satisfaction of this Court that Mr. Raymond Marshall damaged the well, much less in a deliberate manner.

Finally, this Court is not satisfied that Mr. Raymond Marshall and his family members repeatedly threatened, harassed and intimidated the Petitioners by "gestures and word of mouth." The Petitioners made some general allegations in their testimony, however, none to the satisfaction of this Court.

Mrs. Lee appeared for the first time to testify on her own behalf after she was summoned to court in this case. This Court is not satisfied, given Mrs. Lee's testimony, that she occupies, controls, or holds over on land belonging to the Petitioners. Mrs. Lee testified that she was born and raised upon the land on which she presently lives. This testimony was not challenged by the Petitioners, nor did the Petitioners offer any testimony to the contrary to the satisfaction of this Court. Rather, Mrs. Lee's testimony created a presumption that she's lived on the land claimed by the Petitioners for over 60 years, 40 years prior to the Petitioners' claim. There has been no testimony or evidence to rebut this presumption.

This Court was also not provided evidence or testimony that Mrs. Lee publicly announced at any meetings that she did not intend to comply with court orders, that she damaged any well system or that she threatened, harassed and intimidated the Plaintiffs by gesture or by "word of mouth."

Testimony was submitted to the Court that Mrs. Lee has a grazing permit for another area and that she has nine (9) head of sheep. Mrs. Lee testified that these sheep are corralled. Furthermore, this Court did not receive any testimony that

these livestock have been grazing in the disputed grazing area. All testimony submitted indicate that the nine (9) sheep are corralled. Thus, this Court presumes that these sheep are fed by the owners. The Court notes that the corralling of sheep is excluded pursuant to 3 N.N.C. Sec. 937.

Finally, testimony was submitted to this Court that various structures were being built in Mrs. Lee's area. However, further testimony indicates that the structures are within the Lees' present residence area and are probably not subject to claim by the Petitioners, so as to preclude such structures.

## PERMANENT INJUNCTION

A permanent injunction restraining Respondents from further threatening, harassing, intimidating and making physical contact with Petitioners is requested by the Petitioners. However, before deciding whether an injunction as requested is needed, this Court finds it necessary to obtain further information regarding permits and customary use areas by both the Petitioners and Respondents and others within the claimed area so as to establish boundaries. The Court also must obtain information regarding grazing by the parties and others, pursuant to 3 N.N.C. Secs. 936 and 942, as well as other provisions that support and further the Navajo Nation grazing policies.

IT IS HEREBY ORDERED that two fact finders be appointed to conduct an investigation and to submit to this Court their findings in forty-five (45) days regarding the permitters, the number of sheep units per permit, land uses by the permitters and other interests set out by this Court so as to clarify boundaries. Each of the fact finders is authorized by this Court as officers of the Court to obtain needed information and each is to be paid a reasonable fee for their services, including mileage and per diem.

IT IS FURTHER ORDERED, pending the gathering and submission of information, that the Petitioners and Respondents are to be mutually enjoined from making contact with one another, harassing, threatening or intimidating one another.

IT IS FINALLY ORDERED that neither of the parties are to discuss the pending case, in order to avoid further conflict, until this Court determines what areas constitute the Petitioners' use areas from which Respondents should be enjoined pursuant to the December 12, 1974 Order and the subsequent order of January 10, 1986. This Order does not invalidate the December 12, 1974 and January 10, 1986 Orders. However, this Court is mindful that upon the submission of the findings by the appointed fact finders, boundaries shall be considered in accordance with and consistent with the Navajo Bill of Rights, Navajo Grazing laws and policies, as well as social goals and this Court is mindful to do substantial justice between the parties.

The appointment of fact finders shall issue in a separate order within fifteen (15) days and the findings shall be submitted to this Court within forty-five (45) days from the day of appointment, unless ordered otherwise.